**UNITED STATES of America**

v.

**William MORALES, Defendant.**

**No. S6 02 CR. 583(WHP).**

United States District Court, S.D. New York.

Sept. 8, 2003.

Laurie A. Korenbaum, Assistant United States Attorney, New York City, Gary G. Becker, Gerald B. Lefcourt, P.C., New York City, for Defendant Morales.

## MEMORANDUM AND ORDER

PAULEY, District Judge.

By omnibus pre-trial motion, defendant William Morales ("Morales") moves: (1) to dismiss Count One of the First Superseding Indictment as duplicitous, or in the alternative, to sever the alleged schemes; (2) to suppress the evidence seized from 735 Walton Avenue, Apt. E12, Bronx, New York (the "Walton Avenue Apartment"); (3) to suppress his post-arrest statements because they were obtained in violation of *Miranda;* (4) to obtain disclosure of the identities of the Government's confidential sources; (5) to dismiss Count Five of the First Superseding Indictment because Morales did not possess a "firearm" as that term is defined in 18 U.S.C. § 921(a)(3); and (6) to obtain a bill of particulars pursuant to Rule 7(f) of the

Federal Rules of Criminal Procedure and grand jury materials, as well as discovery pursuant to Rule 16 of the Federal Rules of Criminal Procedure, the Jencks Act, 18 U.S.C. § 3500, *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). For the reasons set forth below, defendant's motions are denied.

## PROCEDURAL HISTORY

On April 11, 2003, this Court heard oral argument on Morales' motions. At the conclusion of that argument, this Court ordered a two-pronged evidentiary hearing: (1) pursuant to *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), to determine whether the Government knowingly or with reckless disregard for the truth made material false statements in, or omitted material information from, their search warrant affidavit; and (2) to determine whether to suppress Morales' post-arrest statements.

In a letter to the Court the day before the hearing, defendant advanced a new argument, not raised in his earlier briefs. Namely, Morales asserted that Counts Two and Five of the First Superseding Indictment were multiplicitous because they charged two distinct violations of 18 U.S.C. § 924(c). (Letter to the Court from Gary G. Becker, dated April 10, 2003 ("April 10 Letter").) Defendant argued that courts in the Second Circuit have held that a defendant who uses multiple firearms in connection with a single drug trafficking crime may not be charged with more than one violation of § 924(c). (April 10 Letter at 1.) This contention was discussed briefly at oral argument on April 11, but given the date of defendant's submission, the Court afforded the Government time to respond. (Transcript of Hearing, dated April 11, 2003 ("April 11 Tr.") at 4–5.) In its response dated April 25, 2003, the Government disputed defendant's interpretation of Second Circuit precedent. However, "in an abundance of caution, and to avoid unnecessary litigation on this subject," the Government indicated that it would seek a "superseding indictment charging only one Section 924(c) count in connection with the narcotics conspiracy." (Letter to Court from Assistant United States Attorney Laurie A. Korenbaum, dated April 25, 2003, at 1–2.)

Over the course of the action, there were several superseders filed by the Government that do not bear on the issues raised by Morales. On May 6, 2003, one day prior to the scheduled evidentiary hearing, the Government obtained the Sixth Superseding Indictment in this case. Count Two of the Sixth Superseding Indictment charges a single violation of § 924(c), combining the two offenses formerly alleged in Counts Two and Five of the First Superseding Indictment. (Sixth Superseding Indictment ¶ 5.) However, since Count Two of the Sixth Superseding Indictment still charges Morales with possession of, *inter alia,* the "9 mm semi-automatic weapon" that is the subject of his § 921(a)(3) motion, Morales' motion to dismiss Count Five of the First Superseding Indictment is converted by this Court to a motion to dismiss those portions of Count Two of the Sixth Superseding Indictment concerning the "9 mm semi-automatic weapon." (Sixth Superseding Indictment ¶ 5.) Further, any of Morales' motions that specifically reference a prior indictment will be interpreted by this Court to refer to the corresponding portions of the Sixth Superseding Indictment.

## BACKGROUND

Over several days in May and June 2003, this Court conducted the aforementioned evidentiary hearing. Testifying for

the Government over the course of the hearing were New York Police Department ("NYPD") Sergeant David S. Glassberg ("Sgt. Glassberg"), formerly of the 40th Precinct in the Bronx, New York, and Drug Enforcement Agency ("DEA") Special Agent Donald S. Waddell ("Special Agent Waddell"). The defendant offered no witnesses, but comprehensively cross-examined both of the Government's witnesses. After evaluating the demeanor and credibility of the witnesses, and evaluating the exhibits, the Court makes the following findings of fact.

I. *Morales' Arrest and Post–Arrest Statements*

On April 2, 2002, DEA agents obtained a warrant for Morales' arrest based on a sealed complaint alleging that Morales, along with his brother and another individual, ran a heroin distribution "spot" that operated in the vicinity of St. Ann's and Cypress Avenues between 138th and 140th Streets in the Bronx, New York (the "Distribution Spot"). (Complaint, dated April 2, 2002 ("Compl.") ¶¶ 3–6; Transcript of Evidentiary Hearing, dated May 7, 2003 ("May 7 Tr."), at 9.) Morales was arrested on April 9, 2002, when he exited the building at 735 Walton Avenue. (May 7 Tr. at 31–32, 43–44; Government's Exhibit ("GX") 3501–A: Search Warrant Affidavit of Special Agent Waddell, dated April 9, 2002 ("Waddell Aff.") ¶ 11.) While seated in a police car, Morales was read his *Miranda* rights by DEA Special Agent Mike Williams. (Transcript of Evidentiary Hearing, dated June 24, 2003 ("June 24 Tr.") at 12–14, 40–41; GX 3501–1: NYPD Complaint Form Details ¶ 1.)

A short time thereafter, Morales was brought to the 40th Precinct and placed in the "juvenile room." (June 24 Tr. at 15.) As Morales sat in the juvenile room, Sgt. Glassberg entered and asked him whether he wanted to remove his expensive-looking shirt prior to leaving the precinct. (June 24 Tr. at 19–20.) Morales told Sgt. Glassberg that he would just bring it with him to "central booking," at which point Sgt. Glassberg told Morales that he was not going to "central booking," but instead was being transported to "federal court in Manhattan, down to the Southern District." (June 24 Tr. at 21.) Upon learning that he would be transferred to federal custody, Morales became visibly ill, and Sgt. Glassberg brought him to the precinct bathroom. (June 24 Tr. at 21–22.)

After "dry heaving" in the precinct bathroom, Morales made certain unsolicited oral statements to Sgt. Glassberg. (June 24 Tr. at 22–26.) Morales stated, in sum and substance, that "he knew [the authorities] were watching him and thought that he would have been arrested the night before." (GX 3501–1 ¶¶ 2–3; June 24 Tr. at 22, 24–25.) Further, Morales made statements to the effect that "his crew has no violence in it and he will only do five years." (GX 3501–1 ¶ 3; June 24 Tr. at 24–25.) Finally, Morales indicated that "he knew he would be finally caught. He stated that he was in the game and knew it would end someday, the same as Bloody Rich and Andy." (GX 3501–1 ¶ 3; June 24 Tr. at 24–25.) Sgt. Glassberg "jotted down" the substance of Morales' oral statements on a piece of paper immediately after leaving the bathroom, and gave those notes to another officer. (June 24 Tr. at 26–27.) Since then, they have been misplaced. (June 24 Tr. at 27.) Sgt. Glassberg soon thereafter prepared an NYPD Complaint form that contained his characterizations of Morales' oral statements. (GX 3501–1; Tr. at 27–29.)

Although the testimony at the evidentiary hearing established that Morales made the foregoing statements in the 40th Precinct bathroom (June 24 Tr. at 21–26, 31,

33, 35, 61), the NYPD Complaint form indicates that Morales made the statements in the juvenile room. (GX 3501–1, Details ¶ 2.) Sgt. Glassberg attributed this discrepancy to a simple error on his part while hastily preparing the report. (June 24 Tr. at 31–32, 98.)

## II. *The Search Of The Walton Avenue Apartment*

Also on April 9, 2003, Special Agent Waddell obtained a warrant to search the Walton Avenue Apartment. (May 7 Tr. at 5; GX 3501–A ¶ 4 & Attachment A.) In his affidavit supporting the application, Special Agent Waddell made the following representations: (1) that he has significant training and experience concerning narcotics investigations and searches (Waddell Aff. ¶¶ 2, 15); (2) he was personally involved in the investigation of Morales for distribution of narcotics (Waddell Aff. ¶¶ 3, 8); (3) on March 18, 2002, Morales was arrested at the Distribution Spot and charged in connection with the sale of heroin to an undercover NYPD officer (Waddell Aff. ¶ 9); (4) he spoke with another officer who had performed surveillance on Morales on April 8, 2002, and that Morales had been observed entering 735 Walton Avenue and leaving the next morning, at which time he was arrested (Waddell Aff. ¶ 11); (5) he reviewed Morales' arrest records and determined that Morales gave the Walton Avenue Apartment as at least one of his addresses (Waddell Aff. ¶ 12); (6) he personally observed, and had been informed that other officers had observed, Morales enter and leave 735 Walton Avenue "on a regular basis for the past several months, during the course of this investigation" (Waddell Aff. ¶ 12); and (7) Morales resides at the Walton Avenue Apartment (GX 3501–A ¶¶ 12, 15).

Special Agent Waddell based his representation concerning Morales' residence on his own surveillance during the investigation (Waddell Aff. ¶ 12), as well the surveillance of other members of the investigatory team and pedigree information provided to him by the NYPD, including an NYPD Intelligence Division Report (GX 1) and a New York New Jersey High Intensity Drug Trafficking Area ("H.I.D.T.A.") Mugshot Profile (GX 2). Both the Intelligence Division Report and H.I.D.T.A. Profile list the Walton Avenue Apartment as at least one of Morales' addresses. (May 7 Tr. at 28; GX 1; GX 2.) Special Agent Waddell averred that, based on his training and experience, as well as the specific information developed during the investigation, there was probable cause to believe that Morales kept records of, and other items related to, narcotics transactions at the Walton Avenue Apartment. (GX 3501–A ¶¶ 14–17.) Magistrate Judge Gorenstein signed the search warrant. (GX 3501–A.) Law enforcement officers executed the search warrant that day, and seized certain records and other items, including a partially-disassembled "Tec–9 automatic pistol," a .38 caliber speed loader, two 30–round 9 mm ammunition magazines, five rounds of .38 caliber ammunition, and numerous personal papers, pictures and documents belonging to Morales. (Affirmation of Gary G. Becker, Esq., dated September 6, 2002 ("Becker Aff.") Ex. D: Search Warrant Return, Inventory Of Property Taken Pursuant To The Warrant.)

## DISCUSSION

### I. *Motion To Dismiss Or Sever*

 Defendant moves to dismiss as duplicitous Count One of the Sixth Superseding Indictment on the grounds that it charges two distinct crimes, a heroin conspiracy and a crack cocaine conspiracy. Defendant moves in the alternative to sev-

er the trial of the crack cocaine and heroin schemes.

It is well-settled that an allegation of several distinct crimes in a single conspiracy count is not duplicitous because the crime charged is the single offense of conspiracy, however diverse its objects. *United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir.1992); *accord United States v. Tutino*, 883 F.2d 1125, 1141 (2d Cir. 1989) ("This Circuit has held that acts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme."); *United States v. Berger*, 224 F.3d 107, 114–15 (2d Cir.2000) (holding that a single conspiracy is not transformed into multiple conspiracies merely by virtue of the involvement of two or more phases or spheres of operation). This rule is routinely applied in narcotics cases, as "it has been long established that a conspiracy to distribute two controlled substances is not duplicitous." *United States v. Ortega*, No. 00 Cr. 432(DLC), 2000 WL 1577193, at *1 (S.D.N.Y. Oct. 23, 2000) (citing *United States v. Murray*, 618 F.2d 892, 898 & n. 7 (2d Cir.1980)); *accord United States v. Benjamin*, 72 F.Supp.2d 161, 173 (W.D.N.Y.1999) (holding that count alleging single narcotics trafficking conspiracy accomplished through distribution of marijuana, cocaine and crack cocaine not duplicitous). Accordingly, defendant's motion to dismiss Count One of the Sixth Superseding Indictment as duplicitous is denied.

■ With respect to defendant's motion to sever the allegedly distinct crack cocaine and heroin schemes, a motion to sever is "committed to the sound discretion of the trial judge." *United States v. Casamento*, 887 F.2d 1141, 1149 (2d Cir. 1989); *accord United States v. Gardell*, No. S4 00 Cr. 632(WHP), 2001 WL 1135948, at *6 (S.D.N.Y. Sept. 25, 2001). In order to further the ends of judicial economy, and because there is no indication that failure to sever in this case would visit substantial prejudice on Morales or result in a miscarriage of justice, this Court declines to exercise such discretion. *See United States v. Rosa*, 11 F.3d 315, 341 (2d Cir.1993) (denying severance); *United States v. Patterson*, No. 02 Cr. 283(WHP), 2002 WL 31890950, at *9 (S.D.N.Y. Dec. 27, 2002) (same). Accordingly, defendant's motion to sever the allegedly distinct crack cocaine and heroin schemes is denied.

II. *Motion To Suppress Evidence Seized During The Search*

Morales moves to suppress evidence seized during the April 18, 2002, search of the Walton Avenue Apartment on the grounds that Special Agent Waddell made material misstatements and omissions in his affidavit in support of the search warrant for the Walton Avenue Apartment, and that the warrant, as issued, is not supported by sufficient probable cause. Both of defendant's contentions are flawed.

■ A magistrate judge's probable cause determination is entitled to "substantial deference" when reviewed by a district court, and any doubts are to be resolved in favor of upholding the determination. *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir.1983); *accord United States v. Martin*, 157 F.3d 46, 52 (2d Cir. 1998); *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir.1993). A magistrate's determination of probable cause need only be supported by a " 'fair probability' that the premises [to be searched] would yield the items specified in the search warrant." *United States v. Love*, 859 F.Supp. 725, 733 (S.D.N.Y.1994); *see also Travisano*, 724 F.2d at 345 ("a search based upon a magistrate's determination will be upheld

by a reviewing court on less persuasive evidence than would have justified a police officer acting on his own"). Indeed, a magistrate's determination of probable cause "is itself a substantial factor tending to uphold the validity of the warrant." *Love*, 859 F.Supp. at 733 (citing *Travisano*, 724 F.2d at 345). It is against this deferential standard that the Court evaluates Magistrate Judge Gorenstein's determination of probable cause in this case.

■ In his affidavit supporting the search warrant application, Special Agent Waddell averred that he has significant training and experience concerning narcotics investigations and searches. (Waddell Aff. ¶¶ 2, 15.) In addition to his training and experience, Special Agent Waddell averred that he had specific information, developed over the course of the investigation, tying Morales and his narcotics activity to the Walton Avenue Apartment. (Waddell Aff. ¶¶ 3, 8, 9, 11–12, 16.) Such representations contained in an affidavit for a search warrant are sufficient to support a finding of probable cause. *See, e.g., Love*, 859 F.Supp. at 734 (record "replete with support" for magistrate's determination of probable cause where affidavit contained information concerning defendant's participation in a narcotics scheme, along with the agent's expert opinion that categories of evidence would be found in defendant's home); *United States v. Gambino*, 734 F.Supp. 1084, 1109 (S.D.N.Y.1990) (search of drug defendant's home supported by probable cause where agent's affidavit contained information concerning defendant's involvement in narcotics conspiracy and agent's expert opinion that individuals involved in narcotics trafficking are likely to keep incriminating evidence in their homes).

One of defendant's primary arguments in favor of suppression is that Special Agent Waddell knew or should have known that Morales did not live in the Walton Avenue Apartment, and therefore mislead the magistrate judge in obtaining the search warrant. Belying defendant's contention, however, is the abundant documentary and testimonial evidence that the Walton Avenue Apartment was at least one of Morales' known addresses.

■ First, the Intelligence Division Report and H.I.D.T.A. Profile, containing pedigree information provided at least in part by Morales, list the Walton Avenue Apartment as one of Morales' known addresses. (May 7 Tr. at 28; GX 1; GX 2.) Second, Morales was observed during the investigation, both by Special Agent Waddell personally and by other members of the investigatory team, entering and leaving the Walton Avenue Apartment "on a regular basis" both before and after engaging in narcotics activity. (Waddell Aff. ¶ 12.) *See United States v. Thomas*, 989 F.2d 1252, 1255 (D.C.Cir.1993) ("observations of illegal activity outside of the home can provide probable cause for the issuance of a search warrant for a suspect's house, even in the absence of an allegation that any illegal activity occurred in the home itself"). Accordingly, this Court rejects defendant's contention that Special Agent Waddell misled the magistrate judge as to Morales' address, as Special Agent Waddell had a more than reasonable basis to believe that Morales resided in the Walton Avenue Apartment. Further, this Court finds that the search warrant issued by Magistrate Judge Gorenstein was amply supported by probable cause, and as a result the search of the Walton Avenue Apartment was entirely proper. Therefore, Morales' motion to suppress the evidence seized from the Walton Avenue Apartment is denied.[1]

---

1. Even assuming *arguendo* that this Court found insufficient probable cause supporting

### III. Suppression of Morales' Post–Arrest Statements

■ Defendant moves to suppress his post-arrest statements on the grounds that they were not voluntary and were obtained in violation of *Miranda.* A defendant's confession may be used against him in a criminal proceeding only where that confession was made voluntarily. *Green v. Scully*, 850 F.2d 894, 900 (2d Cir.1988); *Patterson*, 2002 WL 31890950, at *5; *United States v. Major*, 912 F.Supp. 90, 94 (S.D.N.Y.1996). To determine whether a confession is voluntary:

> a court must examine the totality of the circumstances surrounding the confession . . . and that the relevant circumstances include the conduct of the law enforcement officers, the conditions of the interrogation, and the background of the accused. . . . These circumstances are relevant, however, only as they pertain to the critical issue of whether the law enforcement officers obtained the confession by "overbearing" the defendant's will.

*Major*, 912 F.Supp. at 95. Where a defendant moves to suppress a statement allegedly obtained in violation of *Miranda*, the Government bears the burden of proving by a preponderance of the evidence that the defendant knowingly and voluntarily waived his rights. *See, e.g., United States v. Male Juvenile*, 121 F.3d 34, 39–40 (2d

Cir.1997). The Government has met its burden in this case.

First, the Government provides effectively unrebutted documentary and testimonial evidence that Morales was read his *Miranda* rights by DEA Special Agent Mike Williams immediately after his arrest while seated in a police car. (June 24 Tr. at 12–14, 40–41; GX 3501–1 ¶ 1.) Second, the totality of the circumstances under which Morales made his statements overwhelmingly support the conclusion that the statements were the product of a knowing and voluntary waiver of Morales' *Miranda* rights. *See Major*, 912 F.Supp. at 95.

Although there is a discrepancy between Sgt. Glassberg's testimony and the NYPD Complaint form concerning Morales' location when he made his statements (*compare, e.g.,* June 24 Tr. at 21–26 *with* GX 3501–1 ¶ 2), that discrepancy was explained to this Court's satisfaction by Sgt. Glassberg as a simple clerical error occasioned by his hasty preparation of the report. (June 24 Tr. at 31–32, 98). More importantly, however, Sgt. Glassberg's testimony and the NYPD Complaint form are in total accord concerning the substance of Morales' statements. (June 24 Tr. at 26–29; GX 3501–1.) After sitting through the suppression hearing in this case, the Court has no reason to doubt Sgt. Glassberg's credibility.

The evidence adduced during the course of the suppression hearing clearly estab-

the search warrant, the evidence seized from the Walton Avenue Apartment would still be admissible pursuant to the good faith exception to the exclusionary rule established in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Under *Leon*, evidence may be admitted when the police act with objective good faith pursuant to and within the scope of a search warrant, even if the magistrate erred in issuing the warrant in the first instance. 468 U.S. 897, 104 S.Ct. 3405; *see also United States v. Moore*, 968 F.2d 216, 222 (2d Cir.1992) ("The test of

objective good faith is 'whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.' "). As noted above, Special Agent Waddell acted in good faith in swearing the affidavit and acting on it, and there is no allegation that the officers acted outside of the warrant's scope in executing it. Finally, despite defendant's protestations to the contrary, none of the four clearly-defined exceptions to *Leon* apply. *See* 468 U.S. at 923, 104 S.Ct. 3405.

lishes that, whether Morales' statements were a startled reaction upon learning of his impending transfer to federal custody or the product of deliberate choice, the were given voluntarily. *See United States v. Mitchell,* 966 F.2d 92, 100 (2d Cir.1992) ("Inculpatory statements are not involuntary when they result from a desire to cooperate, or from a defendant's ignorance of, or inattention to, his right to remain silent."). There is no evidence that Sgt. Glassberg "obtained the confession by 'overbearing' the defendant's will." *Major,* 912 F.Supp. at 95; *see also United States v. Okwumabua,* 828 F.2d 950, 953 (2d Cir.1987) (confession deemed voluntary where there was no evidence that defendant was subjected to any threats, physical coercion, or protracted interrogation). Further, there is no indication that Sgt. Glassberg deliberately raised Morales' transfer to federal custody in order to elicit incriminating statements from Morales, or that his questions would be likely to result in such statements. *See, e.g., Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) ("since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response"); *United States v. Morales,* 834 F.2d 35, 38 (2d Cir.1987) ("The questions asked must have been both likely to elicit an incriminating response and to produce psychological pressures that will subject the individual to the 'will' of his examiner."). Accordingly, defendant's motion to suppress his post-arrest statements is denied.

IV. *Disclosure Of The Government's Confidential Sources*

█ Defendant moves this Court to order the Government to disclose the identi-

ties of its confidential informants. It is well-settled that "an informant's identity need not be disclosed unless 'essential to the defense.'" *United States v. Russotti,* 746 F.2d 945, 949 (2d Cir.1984). Courts may order disclosure "where the informant is a key witness or participant in the crime charged, someone whose testimony would be significant in determining guilt or innocence," *Russotti,* 746 F.2d at 950, and whose testimony would be "material to [the defendant's] defense." *United States v. Saa,* 859 F.2d 1067, 1073 (2d Cir.1988). However, disclosure of confidential informants is not required merely in order to permit the defendant to test the credibility of a potential Government witness. *Saa,* 859 F.2d at 1073. Indeed, even participation of the confidential informant in the conspiracy alleged against the defendant is insufficient on its own to warrant disclosure. *United States v. Polanco,* No. 97 Cr. 106(DC), 1997 WL 452389, at *5 (S.D.N.Y. Aug. 8, 1997); *accord Saa,* 859 F.2d at 1073.

The Government has stated unequivocally that it "does not intend to call the confidential informants who are named in the complaint" as witnesses at defendant's trial. (April 11 Tr. at 28.) Therefore, defendant's argument that "[i]f this case is going to come down to the credibility of these informants, we have a right to know who the accusers are" (April 11 Tr. at 26), rings hollow. While the fact that the informants will not testify is not dispositive of the issue, it weighs heavily in favor of finding that the informants are not "essential to the defense." This conclusion is bolstered by the fact that defendant offers nothing other than conclusory statements that the informants are essential. (April 11 Tr. at 25–27.) *See United States v. Martinez,* 634 F.Supp. 1144, 1150 (S.D.N.Y.1986) ("[M]ere speculation ... that the informer may possibly be of some

assistance does not overcome the strong public interest in protecting informants."). Accordingly, defendant's motion for disclosure of the Government's confidential informants is denied.

### V. *Motion to Dismiss Count Two As It Relates To The Partially–Disassembled 9 mm Semi–Automatic Handgun*

█ Defendant moves to dismiss Count Two of the Sixth Superseding Indictment as it relates to the "9 mm semi-automatic weapon" on the grounds that the partially-disassembled Tec–9 pistol recovered from the Walton Avenue Apartment is not a "firearm" under 18 U.S.C. § 921(a)(3) because it was inoperable at the time it was recovered. (Becker Aff. Ex. J: Photograph of partially-disassembled Tec–9 pistol, attached hereto as Appendix A.) For the reasons set forth below, defendant's motion is denied.

Section 921(a)(3) defines a "firearm" as "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device." 18 U.S.C. § 921(a)(3). In an apparent issue of first impression in the Second Circuit, this Court holds that inoperable firearms fall within the ambit of § 921(a)(3)(A)'s definition of "firearm."

First, the statute includes in the definition of a firearm not only those weapons that "will" expel a projectile, but also those "designed to" or that "may readily be converted to" a weapon that will expel a projectile. 18 U.S.C. § 921(a)(3)(A). Whether in pieces or whole, it is clear to this Court that the item represented at Exhibit J to the Becker Affirmation was clearly "designed to," and could "readily be con-verted to" expel a projectile. The defense agreed to as much at oral argument:

> THE COURT: Just thinking downstream to a trial, I bet that the Government could produce one of these firearm experts from the NYPD ... and if you put the parts, those disassembled pieces on that witness stand that the expert sitting there could assemble that 9 millimeter in about five seconds with a jury having all their mouths open. Right?

> MR. BECKER: I would hope ... that such a demonstration ought to be done outside the presence of the jury because I think that is a question for your Honor. It is an initial—but whether or not—he may well be able to do that.

(April 11 Tr. at 32.)

Further, while there are no Second Circuit cases directly on point, it is uniform in circuits that have considered the issue that inoperable firearms fall within the ambit of the statute. *See, e.g., United States v. Reed,* 114 F.3d 1053, 1057 (10th Cir.1997) (holding that, despite testimony indicating gun required fifteen to twenty minutes' manipulation to work, jury could infer that defendant knew inoperable shotgun was "designed to" expel projectile or was "frame" of shotgun); *United States v. Hunter,* 101 F.3d 82, 83–86 (9th Cir.1996) (holding that § 921(a)(3) covers semiautomatic pistol rendered inoperable due to bent firing pin); *United States v. Yannott,* 42 F.3d 999, 1006 (6th Cir.1994) ("the broken firing pin merely temporarily altered the weapon's capability and did not so alter the weapon's design that it no longer served the purpose for which it was originally designed"); *United States v. Willis,* 992 F.2d 489, 491 n. 2 (4th Cir.1993) ("other courts of appeals that have addressed this issue have held consistently that there is no requirement that a firearm be opera-

ble in order to satisfy the definition contained in § 921(a)(3)"); *United States v. Ruiz*, 986 F.2d 905, 910 (5th Cir.1993) ("the filing down of the gun's hammer did not change the fact that the gun was designed to expel a projectile, but rather it merely temporarily altered the gun's capability to accomplish the purpose for which it was designed"); *United States v. Buggs*, 904 F.2d 1070, 1075 (7th Cir.1990) (conviction upheld because inoperable weapon was "designed to shoot" as required by 18 U.S.C. § 921(a)(3)); *United States v. Buggs*, 904 F.2d 1070, 1075 (7th Cir.1990) (" 'The statute does not require that the Government prove the gun was actually capable of firing.' ") (quoting *United States v. Polk*, 808 F.2d 33, 34 (8th Cir.1986)); *United States v. York*, 830 F.2d 885, 891 (8th Cir.1987) (rejecting claim that gun was not firearm where it was "inoperable because it had no firing pin, and ... the cylinder did not line up properly with the gun barrel").

Finally, the legislative history of § 921(a)(3) bolsters the proposition that inoperable firearms were contemplated as falling within the definition of "firearms":

> This provision makes it clear that so-called unserviceable firearms come within the definition. Under former definitions of "firearm," any part or parts of such a weapon were included. It was found impractical to have controls over each small part of a firearm. Thus, this definition includes only the major parts of the firearm, that is, the frame or receiver.

H.R.Rep. No. 90–1577, U.S.Code Cong. & Admin.News at 4410, 4416 (1968). Accordingly, the item represented in Exhibit J to the Becker Affirmation is a "firearm" within the meaning of § 921(a)(3)(A).

■ However, even if the definition of "firearm" under § 921(a)(3)(A) did not include so-called "inoperable firearms," de-

fendant's motion would still be denied. This is because the different parts represented in Exhibit J to the Becker Affirmation include both the "frame" and the "receiver" of a Tec–9 pistol, and are therefore explicitly covered under the language of 18 U.S.C. § 921(a)(3)(B). (*Compare* Appendix A, photograph of partially disassembled Tec–9 pistol recovered from the Walton Avenue Apartment *with* Parts Diagram for Intratec Firearms TEC–DC9 firearm at 929 and 950, attached hereto as Appendix B.) Therefore, defendant's motion to dismiss Count Two of the Sixth Superseding Indictment as it relates to the "9 mm semi-automatic weapon" is denied.

## VI. *Defendant's Pre–Trial Discovery Motions*

At the outset, this Court notes that defendant's failure to file a Local Rule 16.1 Affidavit is a sufficient basis upon which to deny defendant's motions for production of discovery and a bill of particulars. *See* Local Cr. R. 16.1; *United States v. Ahmad*, 992 F.Supp. 682, 684–85 (S.D.N.Y. 1998). This Court nonetheless considers defendant's motion for discovery on its merits.

### A. *Motion For Production Of A Bill of Particulars*

■ Morales moves to require the Government to produce a bill of particulars. A defendant may seek a bill of particulars under Rule 7(f) of the Federal Rules of Criminal Procedure in order to "identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir.1987). A bill of

particulars is not, however, intended to be an investigative tool for the defense, nor is its purpose to compel the Government to reveal its evidence prior to trial. *Patterson*, 2002 WL 31890950, at *9. A bill of particulars is required "only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Feola*, 651 F.Supp. 1068, 1132 (S.D.N.Y.1987), *aff'd*, 875 F.2d 857 (2d Cir.1989) (mem.). "The ultimate test in deciding whether a bill of particulars should be ordered is whether the information sought is necessary, as opposed to helpful, in preparing a defense." *United States v. Lauersen*, No. 98 Cr. 1134(WHP), 1999 WL 440619, at *3 (S.D.N.Y. June 28, 1999). The decision whether to grant a bill of particulars rests within the sound discretion of the district court. *United States v. Barnes*, 158 F.3d 662, 665–66 (2d Cir.1998); *Patterson*, 2002 WL 31890950 at *9.

In this case, the charges in the Sixth Superseding Indictment are sufficiently straightforward, detailing a narcotics distribution conspiracy that is not of exceptional duration or breadth. The Sixth Superseding Indictment lays out a series of overt acts, identifies alleged co-conspirators, and describes, with specific dates and locations, the conspiracy at issue in the case. (Sixth Superseding Indictment ¶¶ 1–4.) Together with the discovery already provided by the Government, the Sixth Superseding Indictment is sufficient to advise Morales of the charges against him, enable him to prepare fully for trial, avoid unfair surprise and preclude a second prosecution for the same offense. *See Torres*, 901 F.2d at 234–35; *Patterson*, 2002 WL 31890950, at *10. Accordingly, Morales' motion for a bill of particulars is denied.

**B.** *Motion For Immediate Production Of Rule 16 Discovery, Witness List, Rule 404(b) Evidence And Grand Jury Materials*

Defendant moves this Court to order the Government to produce immediately a plethora of discovery materials. For the reasons set forth below, defendant's motion is denied. First, the Government avers that it has produced all responsive information pursuant to Rule 16(a)(1)(E)—(G). (Gov't Opp. Br. at 24–25.) The Government further states that it is unaware of any further responsive materials under 16(a), and will promptly produce such material should it obtain any. (Gov't Opp. Br. at 24.) The Court has no reason to believe that the Government has not acted reasonably and in good faith in this regard, and therefore defendant's motion with respect to such material is denied. *See U.S. v. Savarese*, No. 01 Cr. 1121(AGS), 2002 WL 265153, at *2 (S.D.N.Y. Feb. 22, 2002) (denying defendant's request for Rule 16 discovery on grounds that "[t]he record before the Court reveals no reason to believe that the Government has not acted reasonably and in good faith").

Next, defendant requests the Government's witness list. The Government is not required to produce a witness list at this stage in the proceedings in the absence of a particularized showing of need, which is absent here. *See United States v. Alessi*, 638 F.2d 466, 481 (2d Cir.1980); *United States v. Baiad*, No. 89 Cr. 788(MBM), 1990 WL 58058, at *2 (S.D.N.Y.1990). Therefore, defendant's motion for production of the Government's witness list is denied.

Defendant moves for immediate notice of the Government's 404(b) evidence. The Government opposes the motion, offering to provide Rule 404(b) material two weeks prior to trial. "Reasonable notice in advance of trial" does not require

immediate notice at this time. *See Savarese*, 2002 WL 265153, at *3; *U.S. v. Santos*, No. 98 Cr. 736(RWS), 1999 WL 4912, at *7 (S.D.N.Y. Jan. 05, 1999). The Court hereby directs the Government to provide notice of all Rule 404(b) material not later than fourteen days before the start of trial.

 Defendant moves for immediate production of all grand jury materials. Other than witness testimony presented to the grand jury, to which defendant is entitled under 18 U.S.C. § 3500, *see infra* Section VI.C, defendant's request is denied. The Government represents that "no persons other than those permitted under Rule 6(d) of the Federal Rules of Criminal Procedure were present during the grand jury proceedings in this matter, nor has any grand jury material been disclosed to persons other than those authorized under Rule 6(e)." (Gov't Opp. Br. at 28 n. 10.) These representations, coupled with: (1) defendant's failure to demonstrate particularized need or lodge specific factual allegations of government misconduct; and (2) the general presumption of secrecy and closure of grand jury proceedings, convinces this Court that no further disclosure or *in camera* inspection of grand jury material is warranted. *See In re Grand Jury Subpoena*, 103 F.3d 234, 239–40 (2d Cir.1996); *Ida v. United States*, 191 F.Supp.2d 426, 434–35 (S.D.N.Y.2002); *United States v. Labate*, No. S1 00 Cim. 632(WHP), 2001 WL 533714, at *20 (S.D.N.Y.2001). Therefore, defendant's motion for production of grand jury materials, other than those witness statements covered under 18 U.S.C. § 3500, is denied.

### C. *Motion For Immediate Production Of Brady, Giglio and 3500 Material*

 Morales seeks immediate production of all *Brady, Giglio* and § 3500 material. The defendant acknowledges receipt of at least some *Brady* material from the Government. (Def. Pre–Trial Br. at 35.) Further, the Government acknowledges that it is aware of its obligations under *Brady* and its progeny and will provide such information to the defense as soon as it learns of its existence, but that as of this time it is aware of no further *Brady* material in this case. (Gov't Opp. Br. at 28.) Representations such as these are sufficient to satisfy the Government's *Brady* obligations. *See Patterson*, 2002 WL 31890950, at *10. Therefore, Morales' motion to compel production of *Brady* material is denied.

With respect to the Government's obligations under *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the law in the Second Circuit is that *Giglio* material, like *Brady* material, must be disclosed only "in time for its effective use at trial." *In re United States (United States v. Coppa)*, 267 F.3d 132, 142 (2d Cir.2001). The immediate disclosure of *Brady* and *Giglio* material upon a defendant's request, or at any time prior to trial, is not required. *Coppa*, 267 F.3d at 140. In this case, the Government proposes to provide all *Giglio* material in time for its effective use at trial. While this Court has the authority to determine, as a matter of sound case management, when the Government shall disclose *Brady* and *Giglio* material, *Coppa*, 267 F.3d at 143–146, the Government's representations are sufficient in this case.

With respect to any statements by Government witnesses, the Jencks Act, 18 U.S.C. § 3500, prohibits a district court from ordering the pretrial disclosure of witness statements before their direct testimony at trial. *Coppa*, 267 F.3d at 145. This Court will not run afoul of this prohibition, and therefore denies defendant's motion with respect to this material.

To the extent that any material the Government would be required to produce under the Jencks Act is also *Giglio* material, the Government is ordered to produce such information with the related *Giglio* material. If, however, the Government believes that any such production of *Giglio* material poses a threat to the health or safety of any potential witness, it may make an *ex parte* letter application to this Court for modification of this requirement.

## CONCLUSION

For the reasons set forth above, defendant William Morales' pre-trial motions are denied.

APPENDIX A